McKiNNey, J.,
delivered the opinion of the court.
This was an injunction bill to restrain the sale of two slaves claimed by the complainant.
The bill alleges that on the 16th of February, 1850, complainant purchased from the defendant, Maguire, the *366 slaves Eose and child, for $300, wbicb be paid in hand, and took a bill of sale with warranty of title; and that he made said purchase in utter ignorance of the existance of any lien or incumbrance upon the slaves. That on the 15th of January, 1850, the defendant, Baker, recovered a judgment in the circuit court of Davidson, against said Maguire and William B. and William 0. Cummings, for $2245, that at the time of the rendition of said judgment, Maguire owned a small tract of land in Davidson county, which on the 14th day of February he sold and conveyed to one Wetmore, and received from him, in part payment for said land, the two slaves above mentioned; and two days thereafter, said slaves were sold and conveyed to complainant, as before stated. The bill further alleges, that afterwards, on the 25th of February, 1850, an execution issued upon said judgment, and was levied upon said two slaves, as the property of Maguire, and that they were taken out of complainant’s possession by the officer, and placed in the jail of Davidson county. It is charged in the bill, that immediately after the sale of said slaves to complainant, Maguire absconded beyond the limits of this State, taking with him ten or fifteen slaves, and other valuable property. It is likewise charged that a combination had been entered into, between Maguire and his co-defendants in the judgment, William B. and William C. Cummings, one of whom was the father-in-law, 'and the other, the brother-in-law of Maguire, to -defraud the complainant; but it is not’ even intimated that the defendant, Baker, had any knowledge of, or participation therein. The bill prays, that complainant *367 be permitted to replevy said slaves, and that the sale be perpetually enjoined.
The fiat of the judge is as follows: “Upon complainant giving bond, with sufficient security, in the penal sum of six hundred dollars, with the usual conditions, to have the slaves described in the foregoing bill, forthcoming, to answer the farther orders and decrees of the chancery court; let the writ of injunction issue as prayed, and- the sheriff will deliver said slaves to com-fflai/nantP
On filing said bill, on the 19th of April, 1850, the complainant entered into bond, with J. Joiner, as security, in the penalty of six hundred dollars, with the following conditions, to wit: “Now, if the said Benjamin E. Mosley shall' prosecute said injunction with effect, or in case the same shall be dissolved, he will pay to the said Levi Baker, and others, all such damages as they may sustain by reason of the wrongful issuance of the writ of injunction; and shall have said negro slaves, Eose and Bob, forthcoming, to answer the farther orders and decrees of the chancery court in said cause — and shall, moreover, prosecute his said bill with effect, or on failure therein, shall pay all such costs as may be adjudged by the court upon the final hearing of said cause,” &e.
Upon the service of the injunction, the slaves were re-delivered by the sheriff into the possession of the complainant, pursuant to the order of the chancellor.
The defendants demurred to the bill, arid on argument, the demurrer was allowed, and bill dismissed. And on motion, it was ordered that a seire facias should issue to the complainant, to show cause why *368 tbe slaves should not be delivered up; or a decree be rendered against him for the penalty of the injunction bond.
A scire facias accordingly issued against the complainant alone, to which, at the return term, he filed a plea, alleging in substauce, that before the order or decree of the court in the said cause, allowing the demurrer, and dismissing the bill, said two slaves died of cholera, without any fault or negligence on his part; and averring that said bill was filed in good faith.
The truth of this plea not being questioned, it was set down for argument, upon its sufficiency, as a de-fence to the scire facias, and on argument, the chancellor disallowed the plea and decreed against the complainant and his surety, in the injunction bond, for the value of the slaves. From which decree, the complainant appealed to this court.
In this state of the case, the first question is, did the chancellor err, in allowing the demurrer? We think not. Whatever may be the hardship of the case, it presents no ground of equity upon which to restrain Baker from proceeding to subject the slaves to the satisfaction of his judgment against Maguire.
It is a familiar principle, that an execution relates to the test, and binds, not only the goods of the defendant, to which he had title at the test of the writ, but likewise, all other goods to which he may acquire title at any time between the test and return of the writ. 1 Swan, 304. It is clear, therefore, that the lien of the execution afterwards sued out ‘b¡f the? défeñd1-ant, Baker, attached upon the slavfes liSndk'1 Of the complainant, notwithstandin^he^as0-!, pürShaMfr<¥¿ir *369 -a valuable consideration, without knowledge of the lien.
The next jand more important is, whether or not, upon the facts of this case, the complainant is discharged from the obligation of his bond.
We pass by unnoticed, all questions in respect either to the propriety of the remedy resorted to upon the bond, or to the regularity of the proceedings, in order to reach the question upon the merits. Such being the desire of both parties.
At the outset of the investigation, it should be remarked, that for all the purposes of this decision, the allegations and averments of the plea to the scire facias, are tó be taken as true.
We must assume then, that the complainant, in filing his bill, and in obtaining an order for an injunction, ■and the re-delivery of the slaves, acted in good faith, though without sufficient legal cause, under a mistake of his rights; and that the death of the slaves happened without fault, or want of proper care and attention on his part, before any determination upon the merits of the bill.
How then, is the complainant’s possession of the slaves to be regarded, from the time of their re-delivery, under the order of the judge? Is it to be viewed as that of a wrong-doer, who by his own illegal act, has obtained possession of the property of another? 'Certainly not.
It was held by this court, in the case of Moore vs. Crockett, 10 Humph., 365, that slaves in the possession •of a party under an order of a court of chancery, requiring bond for their forthcoming at the termination of the suit, were in custodia, legis, and the possession *370 of the party, was in the character of receiver under the authority of the court.
If this be correct, it follows, that the obligations and liabilities of the complainant, resulting from his possession of the slave, as receiver, were only such as the law imposed upon him. What liability he may have incurred, antecedently, if any, from the fact of his having filed the bill and sued out an injunction, under the circumstances, without sufficient legal cause, is an enquiry not at all important in the determination of the question, whether upon the facts in this record, he can be held liable for the value of the slaves, in any form of proceeding upon the bond; for this may be denied, and yet .his liability to damages, to some extent, in an action on the bond, on the mere ground that the injunction was sued out without legal cause, might well enough be conceded.
The cases to which we have referred upon the general subject under consideration, are not very satisfactory, and certainly not altogether reconcilable. The general principle is laid down in all the elementary books, that if a bond, or other obligation, be upon a condition possible, at the time when it is made, and which afterwards, becomes impossible, by the act of God, or of the law, or of the obligee himself, the obligation will be saved. Com. Dig. Condition (D. 1,) Co. Litt. note a. 1 Saund. B., 274, marg. note 2.
It is said, Com. Dig. Condition (L. 12,) that the non-performance of a condition shall be excused by impossibility, or the act of God, if there be no default in the party. So in a promise, as well as in an obligation or condition, if the party be disabled by the act of *371 God, before a breach, he shall be excused:- as if a man lends a horse to B, for his use, who promises to deliver him upon request, and the horse dies before request.
It is stated (Co. Litt. note <z,) if a man. be bound by recognizance, or bond with a condition, that he shall appear the next term in such a court, and before the day, the cognizee or obligor dieth, the recognizance or. obligation is saved..
The reason given for this is, that the bond or recognizance is a thing in action, and executory, of which no advantage can be taken until there be a default in the obligor.
In the application of the general doctrine, of which, the foregoing instances are cited as illustrations, there is some confusion in the cases, resulting perhaps, in no inconsiderable degree, from losing sight of a clear and well established distinction between obligations created by the law, and those created by express contract of the parties. Where the law .imposes a duty on a party, and he is disabled to perform it, by the act of God, the performance will be excused. But where a party, by his own express contract, engages conditionally to do an act, the performance is not excused by inevitable accident, oí other contingency: And, the reason assigned is, that it was his own folly that he did not stipulate against, and exempt himself from responsibility in certain contingencies. Ohitty on Con., (ed. of 1848) 734, and cases cited in note b. 1 Dev. and Batt., 405. Thus, if a lessee covenant to repair, he is not discharged by the destruction of the 'premises by lightning, fire, storms, &c. So, if he covenant expressly to pay rent, *372 he will be bound to do so, notwithstanding the premises are destroyed, accidentally, during the term. And the same doctrine applies to other cases of express contract, where the parties stand equally innocent. The American authorities referred to in argument, throw but little light upon the subject.
The case in 1 Pickering’s R., 285, was an action of debt on a replevin bond. The defendant died pending the action of replevin, and the suit abated by order of the court. The question in the action of the bond was, whether the condition that the plaintiff, in reple-vin, should prosecute 'his action to final judgment, was saved by his prosecuting it until it abated by the death of the defendant. And the court held that it was: that the performance of the condition of the bond being prevented by the act of God, the obligor and his securities could not be held responsible on the bond. The case in 6 Dana’s R., which was a bill in equity, by a surety, to enjoin the enforcement of a forthcoming bond for the delivery of two slaves, taken in execution, holds that the death of one of the slaves, which occurred before the appointed day of delivery, was a sufficient excuse for its non-delivery, and would exonerate the surety, if the bond were not otherwise forfeited.
Upon the foregoing authorities, we think it is clear, that the condition of the bond, in the case before us, is saved, and that in no form of proceeding can Mosely or his sm’ety be held liable, either for the penalty of the bond, or the value of the slaves.
This must be so, in reason. The slaves were in custody of the law, they perished without fault on the part of the receiver, and before breach of the condition *373 of the bond; for until after the adjudication upon the demurrer, no breach of the condition of the bond could be said to have occurred, and to hold the party liable under such circumstances, for the penalty of the bond, or value of the slaves, would certainly be subversive of sound reason and justice, if we were without authority on the subject.
The decree of the chancellor proceeds upon the idea of a conversion of the slaves, and this ground has been assumed in the argument here. We think it wholly untenable. It is admitted to be true, and is fully established by the authorities cited on this point, that a ministerial officer, acting under legal process, may be guilty of a conversion by an abuse of the process: and so, likewise, may the party who directs or assists in the commission of the conversion, or trespass: as if the goods of one person be taken upon an execution against a different person, and so in other like cases.
And it is likewise admitted, that a judicial officer, ‘and those acting under color of authority from him, may be guilty of a trespass or conversion, in a case where such judicial officer had no jurisdiction over the subject matter. But a conversion is not predicable of the reception or retention of property under the decree of a court of competent jurisdiction; or under the order of a judge, acting judicially in a matter within the scope of his jurisdiction, although the order, or decree, may be erroneous in the particular case, in the absence of malice or intentional wrong. 4 Moore, 361., 3 Stephens’ IT. P., 2683. 1 Chitty’s PI. 18.
It is to be remarked too, that Baker had acquired no title to the slayes, general or special, nor right of *374 possession ; he Lad merely fixed an execution lien upon them, which was arrested for a time by process from the court of chancery, and during the suspension the slaves died. In this state of the case, Hater was not in a condition to' charge Mosely with a conversion of the slaves in equity, any more than at law. His remedy in any aspect of the case, if any he had, must have been based on a different principle.
We think the bond contains three several independent conditions: one to pay all such costs as might be adjudged against the complainant, in case of failure to prosecute with effect. Another, to satisfy all such damages as the defendant might sustain by the wrongful issuance of the injunction; and a third, to have the slaves forthcoming, to abide the final order of the court.
And we concur with the counsel of Hater, that a breach might be assigned upon any ono of these distinct conditions, but we do not concur in the conclusion, that although Mosely -was discharged of the condition to deliver the slaves, he still remained liable for their value, or in other words, that a forfeiture was saved as to one- condition, and incurred as to another.
The case does not call for an opinion upon the question, whether an action might not be maintained upon the bond for the wrongful issuance of the injunction, upon a ground irrespective altogether, of the loss of the slaves, and therefore, we intimate no opinion upon that point.
The position is plausible, on first view, that Mosely and his surety ought to be held liable for the value of the slaves, because, as the death of the slaves did not, in fact, happen until after the appointed day of sale,, *375 and the return day of the execution; hut for the arrest ■of the execution by the issuance of the injunction, Baker would have l’ealized his money by a sale of the slaves. It might have so turned out, but this consideration can have no influence upon the determination of the legal question, whether or not the bond was saved by the death of the slaves.
The result is, that the matter of the plea is a sufficient bar to the scire facias. The decree will therefore be reversed, and the scire facias be dismissed.